1  LTL Attorneys LLP
2  James M. Lee (Bar No. 192301)
   james.lee@ltlattorneys.com
3  Joe H. Tuffaha (Bar No.253723)
   joe.tuffaha@ltlattorneys.com
4  Prashanth Chennakesavan (Bar No. 284022)
   prashanth.chennakesavan@ltlattorneys.com
5  Sarah Silverton (Bar No. 212464)
   sarah.silverton@ltlattorneys.com
6  Kevin B. Kelly (Bar No. 274145)
7  kevin.kelly@ltlattorneys.com
8  300 South Grand Ave., 14th Floor
9  Los Angeles, CA 90071
10 Phone: (213) 612-8900
   Fax: (213) 612-3773
11
12 Attorneys for Respondent DAS Corporation

13              UNITED STATES DISTRICT COURT
14      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| 15 UNITED STATES OF AMERICA., | Case Nos. CV-04-2788-ABC |
| 16 Plaintiff, | CV-04-3386-ABC |
| 17 | CV-05-3910-ABC |
| | (Consolidated Cases) |
| 18 v. | |
| 19 REAL PROPERTY LOCATED AT | **DAS CORPORATION'S RESPONSE** |
| 20 475 MARTIN LANE, BEVERLY | **TO ORDER TO SHOW CAUSE AND** |
| HILLS, CALIFORNIA, | **REQUEST FOR SANCTIONS** |
| 21 | |
| 22 Defendant. | *Request for Judicial Notice filed* |
| | *concurrently herewith* |
| 23 | |
| 24 | <u>Hearing</u> |
| | Date:      January 14, 2018 |
| 25 | Time:      1:30 p.m. |
| | Judge:     Hon. Virginia A. Phillips |
| 26 | Location:  Courtroom 8A |
| 27 | |

28

No. cv-04-2788

ALL FUNDS IN CREDIT SUISSE PRIVATE BANKING ACCOUNT,

Defendant.

No. cv-04-2788

DAS CORPORATION'S RESPONSE TO ORDER TO SHOW CAUSE

# TABLE OF CONTENTS

Table of Authorities ............................................................................................. iii

Introduction ......................................................................................................... 1

Facts & Procedural History ................................................................................. 3

    A.  Third-party criminals defraud DAS ...................................................... 3

    B.  The Swiss government controls the Swiss funds ................................... 3

    C.  The Court grants summary judgment against the government .............. 4

    D.  DAS initiates proceedings in Switzerland. ........................................... 4

    E.  The Swiss freeze, release and transfer funds ....................................... 5

    F.  The Swiss transfer reduces the res ........................................................ 6

    G.  This Court rejects Optional's demand that DAS return funds .............. 7

    H.  DAS is dismissed with prejudice .......................................................... 8

    I.  Optional files an action in state court against DAS .............................. 9

    J.  The Court enters a default *in rem* judgment ...................................... 10

Argument ........................................................................................................... 10

I.  DAS Cannot Be Held in Contempt of the Judgment ............................ 10

    A.  The Court May Not Enforce a Judgment Concerning Foreign Res ...... 10

    B.  DAS Has Not Violated Any Court Order ............................................ 13

        1.  Optional's desired reading of the Court's 2013 *in rem* judgment contradicts the law of the case .......................................... 14

        2.  Optional misconstrues the law of constructive trusts as a remedy for an *in rem* judgment ...................................................... 15

        3.  Optional is estopped from denying the limited size of the res .............. 17

II.  The Court *Could Not* Have Issued an Order Requiring DAS to Return Funds ..................................................................................................... 18

A.  This Court Has Never Had Actual Control Over The Swiss Res ................. 18

B.  The Act Of State Doctrine Bars The Court From Second-Guessing The Swiss Prosecutor's Handling Of The Swiss Account ................................... 20

III. Counsel Should be Sanctioned for Vexatious Multiplication of Proceedings .... 23

Conclusion ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Ah Quin v. Cty. of Kauai Dep't of Transp.*
   733 F.3d 267 (9th Cir. 2013) ............................................................... 23

*Balla v. Idaho State Bd. of Corr.*
   869 F.2d 461 (9th Cir. 1989) ............................................................... 16

*Banco Nacional de Cuba v. Sabbatino*
   376 U.S. 398 (1964) ............................................................................. 28

*Belliveau v. Thomson Financial Inc.*
   313 Fed. Appx. 49 (9th Cir. 2009) ...................................................... 35

*Bilyeu v. Morgan Stanley Long Term Disability Plan*
   683 F.3d 1083 (9th Cir. 2012) ............................................................. 22

*Blixseth v. Yellowstone Mountain Club, LLC*
   854 F.3d 626 (9th Cir. 2017) ............................................................... 37

*Bodner v. Banque Paribas*
   114 F. Supp. 2d 117 (E.D.N.Y. 2000) ................................................. 33

*California Artificial Stone Paving Co. v. Molitor*
   113 U.S. 609 (1885) ............................................................................. 15

*CHoPP Computer Corp. v. U.S.*
   5 F.3d 1344 (9th Cir. 1993) ................................................................. 21

*Contents of Acct. No. 03001288 v. U.S.*
   344 F.3d 399 (3d Cir. 2003) ......................................................... 13, 26

*Credit Suisse v. U.S. Dist. Court for Cent. Dist. of California*
   130 F.3d 1342 (9th Cir. 1997) ...................................................... passim

*FTC v. Productive Mktg., Inc.*
   136 F. Supp. 2d 1096 (C.D. Cal. 2001) ............................................... 19

*Gates v. Shinn*
   98 F.3d 463 (9th Cir. 1996) ................................................................. 16

*Gospel Missions of Am. v. City of Los Angeles*
   328 F.3d 548 (9th Cir. 2003) ......................................................... 23, 24

*Great-W. Life & Annuity Ins. Co. v. Knudson*
   534 U.S. 204 (2002)...........................................................................21

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*
   10 F.3d 693 (9th Cir. 1993) ......................................................16, 19

*In re Philippine Nat'l. Bank*
   397 F.3d 768 (9th Cir. 2005) ................................................31, 32

*Korea Supply Co. v. Lockheed Martin Corp.*
   29 Cal. 4th 1134 (2003) ...............................................................22

*Mattel, Inc. v. MGA Entm't, Inc.*
   616 F.3d 904 (9th Cir. 2010) ......................................................21

*N.L.R.B. v. Sequoia Dist. Council of Carpenters, AFL-CIO*
   568 F.2d 628 (9th Cir. 1977) ......................................................12

*NuScience Corp. v. Henkel*, No. CV 08-2661 R
   FFMX, 2015 WL 103378 (C.D. Cal. Jan. 5, 2015)....................12

*Pacific Harbor Capital, Inc. v. Carnival Air Lines, Inc.*
   210 F.3d 1112 (9th Cir.2000) ...............................................34, 35

*Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*
   866 F.2d 228 (7th Cir. 1988) ......................................................18

*Peterson v. Highland Music, Inc.*
   140 F.3d 1313 (9th Cir. 1998) ....................................................13

*Planned Parenthood of Cent. & N. Ariz. v. Ariz.*
   718 F.2d 938 (9th Cir.1983) .......................................................17

*Roadway Express v. Piper*
   447 U.S. 752 (1980)....................................................................36

*Russell v. Rolfs*
   893 F.2d 1033 (9th Cir. 1990) ....................................................23

*S.E.C. v. Wencke*
   622 F.2d 1363 (9th Cir. 1980) ....................................................20

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.*
   899 F.3d 1064 (9th Cir. 2018) ...............................................28, 29

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, 899 F.3d 1064 (9th Cir. 2018) .................33

*Strategy Center v. Los Angeles County Metro. Transp. Auth.*
  564 F.3d 1115 (9th Cir. 2009) .............................................................................15

*Underhill v. Hernandez*
  168 U.S. 250 (1897)..............................................................................................28

*United States v. $6,600 in Currency*
  2015 WL 6877608 (D. Or. Nov. 4, 2015) .............................................................16

*United States v. 475 Martin Lane*
  406 Fed. Appx. 154 (9th Cir. 2010)......................................................................35

*United States v. 475 Martin Lane*
  488 Fed. App'x 272 (9th Cir. 2012) ......................................................................35

*United States v. Alexander*
  106 F.3d 874 (9th Cir. 1997) ................................................................................19

*United States v. All Funds in Account Nos. 747.034/278, 747.009/278, & 747.714/278
  in Banco Espanol de Credito, Spain*
  295 F.3d 23 (D.C. Cir. 2002) .........................................................................14, 26

*United States v. Approximately $1.67 Million (US) in Cash, Stock & Other Valuable
  Assets Held by or at 1) Total Aviation Ldt.*
  513 F.3d 991 (9th Cir. 2008) ...................................................................14, 25, 26

*United States v. Batato*
  833 F.3d 413 (4th Cir. 2016) ...................................................................13, 26, 27

*United States v. Cuddy*
  147 F.3d 1111 (9th Cir. 1998) ..............................................................................18

*United States v. Hall*
  472 F.2d 261 (5th Cir. 1972) ................................................................................20

*United States v. Mills*
  810 F.2d 907 (9th Cir. 1987) ................................................................................17

*Westlake N. Prop. Owners Ass'n v. City of Thousand Oaks*
  915 F.2d 1301 (9th Cir. 1990) ..............................................................................11

**Statutes**

28 U.S.C. §1927....................................................................................1, 2, 24, 25

**Rules**

Fed. R. Civ. P. 69.................................................................................................13

Fed. R. Civ. P. 70.......................................................................................1, 10, 11

Fed. R. Civ. P. 71.................................................................................................11

**Other Authorities**

Charles Alan Wright & Arthur R. Miller, 18B *Federal Practice and Procedure* §
   4478 Law of the Case (2d ed.)..........................................................................15

242125.2

DAS CORPORATION'S RESPONSE TO ORDER TO SHOW CAUSE

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Based on Optional's contention that "former claimant DAS Corporation ('DAS') wrongfully is in possession of funds (valued at over $12 million) that were the subject of the Court's in rem final judgment entered on May 23, 2013," this Court ordered DAS to show cause why it is not in contempt of the Court's 2013 judgment pursuant to Federal Rules of Civil Procedure 70 and 71. RJN, Ex. A (ECF No. 1248) at 1.[1] Simply put, Optional has misled this Court. The Court should refuse to hold DAS in contempt and consider sanctions under 28 U.S.C. § 1927 for vexatious multiplication of proceedings.

Neither DAS nor the $12+ million were the subject of this Court's 2013 *in rem* final judgment. DAS received funds from the contested Credit Suisse account in 2011, two years **before** the Court's 2013 judgment, pursuant to the direction of the Swiss Prosecutor under that sovereign authority's concurrent jurisdiction. This Court (Collins, J.) oversaw multiple conferences and motions concerning the propriety of the Swiss transfer to DAS pursuant to the Swiss Prosecutor's direction, and ruled not only that DAS' conduct was "not contemptible," but also decided that the transferred funds were no longer subject to Optional's claims in this case. Optional's counsel, Rogari and Lee, know that history well. *See* RJN, Ex. B (ECF No. 1244) at 1 ¶ 1. Yet, Optional failed to disclose this history—which unequivocally forecloses the relief Optional seeks or any entitlement to amounts the Swiss authorities transferred to DAS—in its application.

The law and facts are clear. What Optional has is an *in rem* judgment only for the **remainder** of funds in the Swiss account that existed at the time of the 2013 final judgment. Optional does not allege any interference with that remainder to ground an accusation of contempt.

---

[1] All ECF numbers refer to the leading action, case number 04-2788.

The 2013 final judgment does not mention DAS or the transferred Swiss funds. Before it entered that judgment, this Court ruled in 2011 that it would *not* require DAS to surrender the funds, and then dismissed DAS from the case with prejudice. It would defy common sense to hold that the Court implicitly, and without discussion, used an *in rem* judgment to reverse course years after dismissing DAS from the Court's personal jurisdiction. Optional's argument that the constructive trust established absolute ownership against the world as of 2005 misapplies the law of that remedy.

The Court's prior rulings are final, beyond the reach of appellate review, and not susceptible to attack in a collateral contempt proceeding. Even if this Court felt obliged to reexamine its prior rulings, Judge Collins's two basic conclusions remain determinative. *First*, Judge Collins observed that the Swiss authorities, not this Court, had exclusive actual control over the Swiss accounts. *Second*, Judge Collins refused to interfere with the Swiss decision that was part of regular proceedings in a valid concurrent jurisdiction. Switzerland was the only jurisdiction that actually controlled the Swiss accounts. As the Ninth Circuit has repeatedly held, the well-established act of state doctrine precludes a district court from questioning the decision of a foreign sovereign to hold, release, or transfer funds from an account under that sovereign's control and jurisdiction. It is for that reason that courts have long understood that the lack of actual control over foreign res may limit the effectiveness of their judgments. Optional made a deliberate decision not to pursue its remedy in Switzerland. It cannot demand that a district court undo the consequences of its strategy.

Optional's instant abuse of contempt proceedings is part of a larger pattern of forum shopping and vexatious motion practice. This proceeding is superfluous. Had Optional's counsel provided this Court with accurate information it is doubtful this OSC would have even issued. This is exactly the kind of gamesmanship § 1927 exists to address.

# FACTS & PROCEDURAL HISTORY

## A.   Third-party criminals defraud DAS

Starting roughly in 2000, a Korean investment manager by the name of Christopher "KJ" Kim, along with some of his relatives and alter egos (referred to collectively as "the Kims"), defrauded their investors. RJN, Ex. MM (ECF No. 326) at 2. DAS invested approximately 14 billion Korean won ($12-13 million) with the Kims' investment company. *Id.* Instead of investing the funds for DAS' benefit, however, the Kims either siphoned funds away for personal gain or recycled them in what was essentially a Ponzi scheme. *Id.* at 3. In 2001, the Kims took over the Korean company they re-named Optional, which they used to raise additional capital from investors. *Id.* The Kims put the proceeds of their frauds into various properties located in this district, bank accounts in the U.S., and two accounts with Credit Suisse in Switzerland. *Id.* at 3-4.

In 2004, the United States initiated civil forfeiture proceedings against the various U.S. properties. RJN, Ex. Q (ECF No. 867) at 2. Several cases were consolidated before Judge Audrey Collins into the instant matter. *Id.* In 2005, the U.S. government filed a forfeiture against the two Swiss accounts. RJN, Ex. X (ECF No. 780) at 3. One held the bulk of the funds: Credit Suisse Private Banking Account no. 0251-844548-6 in the name of Kim alter-ego "Alexandria Capital." *Id.*

## B.   The Swiss government controls the Swiss funds

The Court was able to assert *in rem* jurisdiction over foreign accounts outside the Court's control because of a statutory grant of jurisdiction for government forfeiture actions. RJN, Ex. NN (ECF No. 190) at 2. The government invoked the Mutual Legal Assistance Treaty ("MLAT") between the U.S. and Switzerland to request a freeze on the Credit Suisse accounts. RJN, Ex. II (ECF No. 507) at 2. The Swiss government cooperated, while reiterating to the U.S. Attorney's Office that "in the absence of a freeze order from the Swiss Central Authority, Switzerland would not recognize any direct United States jurisdiction over assets located in

242125.2

1 Switzerland." *See id.*

2 ## C. The Court grants summary judgment against the government

3 Both Optional and DAS filed claims in the forfeiture proceedings. RJN, Ex. P

4 (ECF No. 869) at 1. On May 14, 2007, this Court granted summary judgment to the

5 Kims and dismissed the government's forfeiture action. RJN, Ex. MM (ECF No.

6 326). The Ninth Circuit affirmed. RJN, Ex. LL.

7 Beginning in 2004, and simultaneously with this consolidated action, the Kims,

8 Optional, and DAS were parties to several other related proceedings. The Korean

9 government held its own criminal proceedings against the Kims; they were found

10 guilty of money laundering among other charges. RJN, Ex. GG at 3 n. 2. Optional

11 sued the Kims, and won a civil judgment against the Kims for conversion. RJN, Ex.

12 O at 8. DAS sued the Kims in California state court, and eventually reached a

13 settlement following a mediation ordered by the Superior Court. RJN, Ex. X (ECF

14 No. 780) at 5.

15 ## D. DAS initiates proceedings in Switzerland

16 In April 2007, DAS initiated a criminal complaint against the Kims and

17 Alexandria Capital in Switzerland (while the Kims' summary judgment motion

18 against the government was pending). *Id.* at 3. For its part, Optional recognized the

19 potential downside of litigating in this Court ownership of funds when there was a

20 parallel proceeding in a jurisdiction that had actual control:

21 [T]he [Swiss] action might cause the Swiss government to bring its

22 own forfeiture action in Switzerland under Swiss law. While

23 someday, that might well result in Optional getting its money back,

24 is that an efficient use of years of litigation in this Country?

25 RJN, Ex. KK (ECF No. 505) at 3. Optional knew no later than December 22, 2008

26 that DAS had initiated proceedings in Switzerland against the Kims. *See* RJN, Ex. BB

27 (ECF No. 742-6) at 15. At no point did Optional seek to join or intervene in DAS'

28

242125.2

1  case or initiate an action in Switzerland.[2]

2  **E.  The Swiss freeze, release and transfer funds**

3  After the Ninth Circuit affirmed this Court's grant of summary judgment

4  against the government, the Kims moved to compel the government to seek a

5  retraction of the MLAT freeze and in turn return the Kims' property. RJN, Ex. II

6  (ECF No. 507) at 4. Optional and DAS opposed. RJN Exs. JJ-KK (ECF Nos. 506 and

7  505). The government informed the Court that the Swiss MLAT cooperation was

8  likely to end. Because the "government no longer ha[d] any viable interest in the

9  Swiss funds," it could not invoke executive authority to ask for Swiss help. RJN, Ex.

10  II (ECF No. 507) at 1. The Swiss executive explained its perspective that it owes no

11  obligation beyond courtesies under the applicable treaty; "if the United States were to

12  withdraw its MLAT request, the Swiss Central Authority would then 'cancel' the

13  freeze order." *Id.* at 4.

14  For the moment, "the Swiss funds also remained frozen at the request of an

15  examining magistrate based on a criminal investigation being conducted in"

16  Switzerland—prompted by DAS' criminal complaint. *Id.* The Court denied the Kims'

17  motion and simply asked the government not to seek release of the MLAT hold,

18  temporarily maintaining the status quo. RJN, Ex. HH (ECF No. 509) at 1. Nothing

19  prevented Switzerland from determining rights to property located within its

20  borders—especially in the absence of a MLAT freeze in favor of the government's

21  interest—and in April 2009, the Swiss government released the MLAT hold. RJN,

22  Ex. FF (ECF No. 727) at 5. The government did not inform the Court. *See* RJN, Ex.

23  BB (ECF No. 742-6) at 28-31. The Court did not separately order any conduct or

24  forbearance by the claimants.

25

26  [2] Optional did not pursue its rights in Switzerland even when, later in the proceedings, the Court expressly encouraged it to do so. The Court "recognize[d] that Optional
27  would be well advised to pursue all avenues available to it[, …] especially enforcement
28  of its judgment in Switzerland." RJN, Ex. T (ECF No. 818) at 2.

The only proceeding preventing dissipation of the Swiss funds was the independent Swiss investigation related to DAS' criminal allegations. "The Swiss FOJ (counterpart to U.S. D.O.J.) official further advised that, although the Swiss funds also remained frozen at the request of an examining magistrate based on a criminal investigation being conducted in that country, the Swiss Central Authority itself had no influence over the examining magistrate's investigation, which was being conducted independent of the Swiss Central Authority." RJN, Ex. II (ECF No. 507) at 4.

In 2010, the Kims and DAS successfully reached a settlement agreement following a mandatory settlement conference in their California state court action. RJN, Ex. P (ECF No. 869) at 1. As part of the settlement, DAS dismissed its state civil suit against the Kims and withdrew its Swiss criminal complaint. RJN, Ex. X (ECF No. 780) at 5. On February 1, 2011, "the Public Prosecutor lifted the seizure of the assets contained in the Swiss Accounts; upon lifting of the seizure, the Public Prosecutor **ordered** Credit Suisse to make a transfer of 14 billion Korean Won from one of the Swiss accounts to DAS; and the Public Prosecutor **ordered** that DAS and Alexandria pay for certain costs of the Swiss investigation." RJN, Ex. DD (ECF No. 739) (emphasis added).

Pursuant to the Public Prosecutor's order, Credit Suisse effected a transfer of 14 billion Korean Won to DAS on or about February 2, 2011. RJN, Ex. Y (ECF No. 756-3) at 7.

### F.   The Swiss transfer reduces the res

On April 4, 2011, DAS filed a notice withdrawing its claims in this action. RJN, Ex. P (ECF No. 869) at 1. In response, Optional did not pursue any remedy in Switzerland, the jurisdiction that adjudicated rights in property under its control. Instead, Optional and its counsel concocted a far-fetched conspiracy theory.[3] Optional

---

[3] Optional has at various times claimed that the Swiss government took bribes or acted

1  then sued the Kims, DAS, and DAS' lawyers in California state court.

2  On May 2, 2011, this Court ordered for the first time "that no party is to

3  interfere with or disturb *whatever monies remain* in the Credit Suisse accounts."

4  RJN, Ex. CC (ECF No. 740) at 1 (emphasis added). The Court requested that the

5  government "investigate the transaction in Switzerland by which approximately 14

6  billion Korean won were transferred from Alexandria Investment LLC's Credit

7  Suisse account to DAS Corporation" and file a report. *Id.* at 2. The Court also invited

8  Optional to file any motions it saw fit. RJN, Ex. BB (ECF No. 742-6) at 2. Optional

9  was not restricted in its arsenal; the Court encouraged Optional to help the court

10 regain the *status quo ante* if it were possible to do. *Id.* at 34-35.

11 The Court recognized that the Swiss proceedings diminished the res at issue in

12 these actions; the new circumstances made it critical to figure out "what is left to

13 fight about." *Id.* at 24-25, 44. "Optional obviously ha[d] to decide whether the

14 amount remaining in the account is worth pursuing in this case." RJN, Ex. W (ECF

15 No. 782) at 4. When making orders soon after deciding it could not compel DAS to

16 surrender the funds, the Court referred to the remaining properties in order to

17 "prevent the loss of assets like in Switzerland." RJN, Ex. U (ECF No. 804) at 8-9.

18 **G.  This Court rejects Optional's demand that DAS return funds**

19 Taking the Court up on its invitation to try to undo the Swiss orders, Optional

20 moved for contempt against DAS, for contempt against DAS' counsel, and for an

21 order to compel DAS to deposit an equivalent amount of money with the Court. RJN,

22 Ex. Z (ECF No. 745). The government filed reports with the Court relaying

23 information from the Swiss government about the Swiss proceedings. RJN, Exs. EE-

24 FF (ECF Nos 727 and 734). The Court denied all of Optional's motions after full

25 briefing. At the May 2, 2011 status conference, "the Court questioned DAS' and the

26

27 ───────────────

28 as DAS' puppet and that the U.S. government deliberately thwarted its claim in preference to DAS. *See, e.g.* RJN, Ex. V at 9.

242125.2          DAS CORPORATION'S RESPONSE TO ORDER TO SHOW CAUSE

Kims' counsel extensively to attempt to learn whether the transfer of funds from the Credit Suisse accounts to DAS was wrongful in any way." RJN, Ex. X (ECF No. 780) at 5.

Ultimately, this Court concluded it was not, and that contempt sanctions were unavailable. "DAS obtained the relief it sought from a legitimate authority that had both jurisdiction and actual control over the accounts. Simply stated, no district or circuit court order expressly prohibited DAS from doing that." *Id.* at 9. The Court noted that "Optional was aware of DAS' Swiss proceedings, but apparently did not pursue a similar avenue itself." *Id.* The Court similarly rejected Optional's effort to force DAS to deposit an equivalent amount of money with the court. "[T]his Court did not control the Credit Suisse accounts, and DAS obtained its 14 billion won through processes in Switzerland, the jurisdiction that did have actual control over the accounts." *Id.* at 12. The Court emphasized that the key distinctions were (1) the location of the accounts abroad outside the court's control and (2) the "regular procedures in Switzerland" that resulted in the transfer. *Id.* at 12-13.

A few days after the Court's decision, Optional pursued a writ of mandamus in the Ninth Circuit, trying to overturn the Court's decisions. The Ninth Circuit denied the writ petition on October 17, 2011. RJN, Ex. S.

### H. DAS is dismissed with prejudice

On October 19, 2011 DAS renewed its motion to dismiss itself from this action, an effort Optional opposed. RJN, Ex. R (ECF No. 849). This Court granted DAS' motion:

> [T]here appears to be no ground for ordering DAS to surrender the funds to this Court's custody in light of the fact that DAS obtained those funds through the legal process of an authority that had both jurisdiction and actual control over the account from which they came. Furthermore, the Court [previously] found that DAS' conduct was not contemptible.

RJN, Ex. P (ECF No. 869) at 3. Optional's intransigence simply did not "speak to the situation here, where a claimant obtained its remedy from a legitimate authority having concurrent jurisdiction and actual control over the property." *Id.* The Court put its conclusion bluntly: "the Court is not going to order DAS to surrender the funds." *Id.*

Optional once again sought appellate review, and the Ninth Circuit dismissed the appeal on March 12, 2012. RJN, Ex. M. Notably, Optional conceded in briefing to the Ninth Circuit that the monies Swiss authorities transferred to DAS were no longer part of the res:

> The order dismissing DAS from this action and the order denying Optional's motion to compel DAS to bring 14 billion won to the district court for determination of its ownership remove a portion of the res. Because *the loss of a portion of the res will be final regardless of the outcome of the case*, early review by this Court is warranted, appropriate, and indeed crucial."

RJN, Ex. N (Optional's Resp. to Mot. to Dismiss Appeal) at 13-14 (emphasis added). DAS did not participate further in this action and the Court issued no further order relating to the transferred Swiss funds.

## I.   Optional files an action in state court against DAS

On or about December 1, 2011, Optional sued DAS in California state court for various state law claims, which Optional describes as an "attempt[] to recover the $13,000,000 that DAS Corporation stole from the Credit Suisse account." RJN, Ex. E (Appeal No. 13-56823, 2014 WL 1878677) at 13, n.2. The operative First Amended Complaint alleges that DAS and its attorneys "entered into an agreement with the United States government" that "originated with United States attorneys in the Justice department." Supposedly, Swiss authorities transferred the $13 million at issue here with "the approval of the president of the United States so that concessions could be secured in negotiations with Myung Bak Lee for a new trade agreement between the

1  United States and South Korea." RJN, Ex. F (FAC) at 11 ¶ 38.

2      **J.  The Court enters a default *in rem* judgment**

3      With DAS dismissed from the case, Optional sought to adjudicate its claim to

4  only the "remaining funds in [] account No. 0251-844548-6". RJN, Ex. K (ECF No.

5  925) at 2.

6      Shortly after the bench trial started on April 31, 2013, the Kims released their

7  claims to agreed-upon properties, leaving Optional as the only claimant. RJN, Ex. H

8  (ECF No. 1183) at 1. The Court found appropriate "a constructive trust extended to

9  the money the Kims actually stole from Optional, and to all property interests the

10  Kims then held." *Id.* at 6. That included: "All funds in Credit Suisse Private Banking

11  Account No. 0251- 844548-6 in the name of Alexandria Investment, LLC when the

12  government served its arrest warrant on or about August 8, 2005." *Id.* at 4.

13      The Court then entered a final judgment, which makes no mention of DAS.

14  RJN, Ex. G (ECF No. 1187) at 5. The Court ordered "that each of the above

15  properties shall be released forthwith to Optional Capital, Inc., through its counsel of

16  record, Ralph Rogari, and that all released currency shall include all accrued interest."

17  *Id.* The record is not clear as to when or if Optional has tried to exercise its rights in

18  Switzerland to the remaining amounts in the Credit Suisse account.

19      Having obtained this *in rem* judgment, in May 2016 Optional then tried to use

20  it as *res judicata* in its state court action against DAS, filing for summary

21  adjudication. Optional argued that the state court should treat the 2013 federal

22  judgment  as establishing Optional's actual ownership of the Credit Suisse accounts

23  against DAS from 2005. That effort failed with the state court ruling against Optional

24  in July 2016. RJN, Ex. C.

25                                  **ARGUMENT**

26  **I.   DAS CANNOT BE HELD IN CONTEMPT OF THE JUDGMENT**

27      **A.  The Court May Not Enforce a Judgment Concerning Foreign Res**

28      Optional invoked this Court's authority under Federal Rules of Civil Procedure

70 and 71. Neither applies here.

Rule 70 on its face applies against "a party" who fails to comply with court orders.[4] It "is operative only when *a party* refuses to comply with a judgment." *Westlake N. Prop. Owners Ass'n v. City of Thousand Oaks*, 915 F.2d 1301, 1304 (9th Cir. 1990) (quotation, citation omitted) (emphasis in original). DAS was not a party to the 2013 judgment.

Rule 71 at least refers to nonparties,[5] but it provides no assistance to Optional. Caselaw clarifies that that the courts' enforcement power extends only to nonparties who act *with a defendant* to enable an end-run around the order. "[T]o be held liable in contempt, it is necessary that a non-party respondent must either abet the defendant [in violating the court's order] or be legally identified with him," *N.L.R.B. v. Sequoia Dist. Council of Carpenters, AFL-CIO*, 568 F.2d 628, 633 (9th Cir. 1977) (quotation omitted). To hold DAS in contempt under Rule 71, Optional must demonstrate that DAS "acted in concert with defendants in violating those orders, or may be legally identified with defendants." *NuScience Corp. v. Henkel*, No. CV 08-2661 R FFMX, 2015 WL 103378, at *2 (C.D. Cal. Jan. 5, 2015) (citing *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1323 (9th Cir. 1998)).

It is unclear how either Rule 70 or 71 could possibly apply to a nonparty in possession of property lawfully awarded it by a foreign jurisdiction before a district court enters an *in rem* judgment. Optional argues that DAS is "legally identified with the funds" and Rules 70 and 71 apply because "the Swiss funds cannot voluntarily

---

[4] Rule 70 reads: "(a) Party's Failure to Act; Ordering Another to Act. If a judgment requires a party to convey land, to deliver a deed or other document, or to perform any other specific act and the party fails to comply within the time specified, the court may order the act to be done—at the disobedient party's expense—by another person appointed by the court. When done, the act has the same effect as if done by the party."

[5] Rule 71 reads: "Enforcing Relief For or Against a Nonparty. When an order grants relief for a nonparty or may be enforced against a nonparty, the procedure for enforcing the order is the same as for a party."

242125.2

1  return themselves to Optional." App. at 2. That is nonsensical. Unsurprisingly,

2  Optional offers no authority for its assertion, and DAS has been unable to locate any.

3          In fact, as courts and the Department of Justice have recognized, enforcement

4  of *in rem* judgments adjudicating rights in foreign res depends on cooperation from

5  the relevant foreign government, which has to freeze assets to preserve them, and

6  then release assets in accordance with a district court judgment (if the foreign

7  government chooses to recognize it). *See United States v. Batato*, 833 F.3d 413, 421-

8  22 (4th Cir. 2016), *cert. denied*, 138 S.Ct. 66 (2017) (although not an impediment to

9  *jurisdiction*, the *effectiveness* of forfeiture orders depends on "the cooperation (or

10 lack thereof) of foreign nations in enforcing any of the district court's orders");

11 *Contents of Acct. No. 03001288 v. U.S.*, 344 F.3d 399, 405 (3d Cir. 2003) (district

12 court had jurisdiction, but "[t]he U.A.E.'s compliance and cooperation with [the]

13 forfeiture determines [] the effectiveness of the District Court's order"); *United States*

14 *v. All Funds in Account Nos. 747.034/278, 747.009/278, & 747.714/278 in Banco*

15 *Espanol de Credito, Spain*, 295 F.3d 23, 26–27 (D.C. Cir. 2002) (effectiveness "of

16 the forfeiture orders of the district courts" depended on "Spain's compliance and

17 cooperation"); *United States v. Approximately $1.67 Million (US) in Cash, Stock &*

18 *Other Valuable Assets Held by or at 1) Total Aviation Ldt.*, 513 F.3d 991, 998 (9th

19 Cir. 2008) (agreeing "with the analysis of the D.C. and Third Circuits" in *03001288*

20 and *Banco Espanol); RJN, Ex PP (Dept. of Justice Asset Forfeiture Policy Manual

21 (2016)) at 135-36 (explaining repatriation of foreign assets requires a freeze and

22 further proceedings following entry of judgment, and that the foreign government

23 may choose not to recognize the judgment for any number of reasons); *see also infra*

24 *at* II.

25          There is simply no procedural mechanism permitting the enforcement of an *in*

26 *rem* judgment adjudicating rights in foreign res in a district court. That is especially

27 the case here given that the foreign government with control over the relevant

28 account ordered the funds released to DAS before the entry of any judgment.

### B.   DAS Has Not Violated Any Court Order

Even if this Court has the authority to effectuate its *in rem* judgment with respect to the Swiss res—it does not—DAS cannot be held in contempt because it has not violated any order.

The standard for contempt is the same now as when the Court determined DAS' receipt of the transferred funds was "not contemptible" the first time. *See* RJN, Ex. X (ECF No. 780) at 6. "[C]ontempt is a severe remedy, and should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *California Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885). A party seeking civil contempt sanctions must prove "(1) that [the individual or entity] violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence." *Labor/Cmty. Strategy Center v. Los Angeles County Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009) (citation omitted). "[T]o support a contempt motion, the order alleged to have been disobeyed must be sufficiently specific." *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 465 (9th Cir. 1989). "If an injunction does not clearly describe prohibited or required conduct, it is not enforceable by contempt." *Gates v. Shinn*, 98 F.3d 463, 468 (9th Cir. 1996). A court may not hold a person in contempt unless it finds that the party requesting the sanction has proven contempt by clear and convincing evidence. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). Optional fails at the first step—identifying a court order DAS violated.[6]

---

[6] Optional would prefer to treat the 2013 judgment as an *in personam* money judgment against DAS, but there is no such judgment.  If there were, contempt would still not be an available avenue for enforcement. *See generally* Fed. R. Civ. P. 69; *see also United States v. $6,600 in Currency*, 2015 WL 6877608, at *2 (D. Or. Nov. 4, 2015).

### 1.   Optional's desired reading of the Court's 2013 *in rem* judgment contradicts the law of the case

The funds the Swiss government transferred to DAS in 2011 are not mentioned in the Court's 2013 final judgment or accompanying findings and conclusions. Neither is DAS. In the simplest terms there is no order of this Court DAS could have violated.

Optional deliberately uses the vague term "Swiss funds" to misleadingly refer to the different states of the Credit Suisse account as if they were all the same—the full account in 2005, the transferred funds in 2011 and the remainder claimed by Optional in 2013. App. at 2. Optional insists that because the judgment states Optional "was and is" the owner of "all funds" in the Swiss account "when the government served its arrest warrant on or about August 8, 2005," it is also an order that requires the surrender of all "the Swiss funds." That is not how *in rem* judgments work. *See infra* at I.B.2. But more fundamentally, Optional's argument is precluded by the law of the case.

The law of the case doctrine provides that the decision on a legal issue by the same or a superior court must be followed in all subsequent proceedings in the same case. *Planned Parenthood of Cent. & N. Ariz. v. Ariz.*, 718 F.2d 938, 949 (9th Cir.1983). "[I]n order to maintain consistency during the course of a single case, reconsideration of questions previously decided should be avoided." *United States v. Mills*, 810 F.2d 907, 909 (9th Cir. 1987). This Court held that DAS "obtained the assets by regular procedures in Switzerland." RJN, Ex. P (ECF No 869) at 3. The Court further stated it "is not going to order DAS to surrender the funds." *Id.* at 5. That order is final and binding, and thus precludes any further order requiring "DAS to surrender the funds."

Optional may argue that the Court's decisions were clearly erroneous or resulted in a "manifest injustice," requiring it to revisit its prior order. *United States v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir. 1998) (listing exceptions to law of the case

1  doctrine). Optional needs more than indignation to succeed. The "wrongness" of the

2  prior rulings must "strike us as wrong with the force of a five-week-old,

3  unrefrigerated dead fish." *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d

4  228, 233 (7th Cir. 1988). This stringent standard "rests on good sense and the desire

5  to protect both court and parties against the burdens of repeated reargument by

6  indefatigable diehards." Charles Alan Wright & Arthur R. Miller, 18B *Federal*

7  *Practice and Procedure* § 4478 Law of the Case (2d ed.). Without such deeply

8  offended sensibility a court abuses its discretion to stray from the law of the case. *See*

9  *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (abuse of discretion to

10  avoid law of the case absent one of the exceptions).

11  Good sense should prevail here. Indeed, "court orders *must* be read in light of

12  their stated purpose." *FTC v. Productive Mktg., Inc.*, 136 F. Supp. 2d 1096, 1109

13  (C.D. Cal. 2001) (emphasis added). Court orders are presumed "to comply with

14  common sense" and "a reasonable reading." *In re Dual-Deck Video Cassette*

15  *Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) (reversing contempt ruling

16  because plaintiff's interpretation of court order would be "absurd"). This Court was

17  fully aware how DAS received funds from the Credit Suisse account. It refused to

18  order DAS to surrender the funds for good reasons that have not changed. The prior

19  orders are final. Nothing in the final judgment suggests that the Court revisited—after

20  DAS was dismissed from the case and without notice—its own decision finding that

21  there were no grounds to require DAS to return funds. It is unreasonable and far from

22  "common sense" to conclude otherwise.

### 2.  Optional misconstrues the law of constructive trusts as a remedy for an *in rem* judgment

25  Even setting aside this Court's prior rulings, which preclude the relief Optional

26  seeks, Optional's application is without merit because it relies on a fundamental

27  mischaracterization of *in rem* judgments.

28  Optional argues that an *in rem* judgment is enforceable against the world, so it

---

15                    No. cv-04-2788

can be enforced against DAS for property in existence as of 2005. App. at 2. But an *in rem* judgment only applies going forward. Indeed, the reason assets are frozen at the outset of forfeiture actions—as DAS, working with Swiss authorities, did here— is because "[a] court entering a decree binding on a particular piece of property is necessarily faced with the danger that its judgment may be disrupted *in the future* by members of an undefinable class–those who may come into contact with the property. The *in rem* injunction protects the court's judgment." *United States v. Hall*, 472 F.2d 261, 266 (5th Cir. 1972) (cited with approval in *S.E.C. v. Wencke*, 622 F.2d 1363, 1370 n.11 (9th Cir. 1980)). There is no retroactive effect to the Court's *in rem* judgment.

The constructive trust created in 2013 does not give Optional retroactive rights that trump prior rulings or awards to other creditors, particularly those rendered by another valid concurrent jurisdiction. "The retroactive creation of a constructive trust is not necessarily a self-executing award of equitable title." *CHoPP Computer Corp. v. U.S.*, 5 F.3d 1344, 1348 (9th Cir. 1993). Optional's rights may have accrued as a legal fiction in 2005; that is why Optional may have stepped into the Kims' shoes in 2013. California law still does not give Optional the right to "interfere with a third party's prior claim that has been reduced to judgment and levied upon." *Id.*

"A plaintiff seeking imposition of a constructive trust must show: (1) the existence of a res (property or some interest in property); (2) the right to that res; and (3) the wrongful acquisition or detention of the res by another party who is not entitled to it." *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 908–09 (9th Cir. 2010). The res for the constructive trust can only be "money or property identified as belonging in good conscience to the plaintiff [which can] clearly be traced to particular funds or property *in the defendant's possession*." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002) (emphasis added). Neither the Kims nor the Court could turn over to Optional in 2013 something the Swiss authorities had already transferred to DAS. The transferred funds were no longer in the Credit Suisse

1   account in 2013. Optional cannot expand the definition of the res beyond property in
2   the Swiss account at the time of the judgment. *Cf. Korea Supply Co. v. Lockheed*
3   *Martin Corp.*, 29 Cal. 4th 1134, 1150 (2003) (res must be "in the defendant's hands")
4   (quoting Dobbs on the Law of Remedies). It does not matter that Optional asserts
5   rights stemming from 2005; the order does not allow it to undo the award of funds to
6   DAS from the Swiss authorities, or to claim more than what was in the accounts in
7   2013.[7]

8              **3.    Optional is estopped from denying the limited size of the res**

9          Optional and its counsel have admitted that funds Swiss authorities transferred
10  to DAS were not part of the res in 2013. Optional repeatedly asserted that premise
11  both to this Court and the Ninth Circuit to obtain relief—namely an order undoing the
12  Swiss adjudication and requiring DAS to return funds. Optional should be estopped
13  from taking a position now that contradicts its prior admissions.

14         "[J]udicial estoppel is an equitable doctrine invoked by a court at its
15  discretion." *Ah Quin v. Cty. of Kauai Dep't of Transp.*, 733 F.3d 267, 270 (9th Cir.
16  2013) (quotation marks and citations omitted). "[I]ts purpose is to protect the
17  integrity of the judicial process by prohibiting parties from deliberately changing
18  positions according to the exigencies of the moment." *Id.* It is "intended to protect
19  against a litigant playing fast and loose with the courts." *Russell v. Rolfs*, 893 F.2d
20  1033, 1037 (9th Cir. 1990). This Court has "discretion to consider a statement made
21  in briefs to be a judicial admission." *Gospel Missions of Am. v. City of Los Angeles*,
22  328 F.3d 548, 557 (9th Cir. 2003).

23         Optional now claims that the 2013 judgment applies to funds transferred to
24  DAS in 2011. That should come as a surprise to this Court. In petitioning the Ninth
25  Circuit for a writ of mandate, Optional urged that "unless [the Ninth Circuit]

26  ───────────────

27  [7] Optional likely has, at most, a general creditor's claim against the Kims. *See Bilyeu v. Morgan Stanley Long Term Disability Plan*, 683 F.3d 1083, 1095 (9th Cir. 2012)
28  (where proceeds have dissipated, plaintiff's claim is only that of a general creditor).

intervenes, Optional will *lose its constructive trust remedy to the thirteen million dollars* because those funds will have been dissipated." RJN, Ex. S at 18 (emphasis added). In filing its successive appeal to protest DAS' dismissal, Optional acknowledged that "a portion of the res" had been "removed," and the "loss of the res will be final regardless" of whether Optional or some other claimant ultimately prevailed. RJN N (12/27/11 Br.) at 13-14. In a 2012 appeal, Optional noted that the Kims "caused $13 Million Dollars to be *removed from the jurisdiction of the court*[.]" RJN, Ex. QQ at 68.

To obtain emergency relief, Optional "tried to benefit from the admission" that the funds were removed in 2011; now Optional represents that the transferred funds were part of the 2013 final judgment. *Gospel Missions*, 328 F.3d at 557 (exercising discretion to treat statement in brief as admission because party had been trying to benefit from contradictory positions). Optional should not be allowed to play fast and loose.

DAS cannot be held in contempt because it did not violate any order requiring it to return the funds it was awarded by Swiss authorities.

## II.   THE COURT *COULD NOT* HAVE ISSUED AN ORDER REQUIRING DAS TO RETURN FUNDS

Optional's Application is premised on reading the Court's 2013 judgment as requiring DAS to return funds that were transferred to it. The judgment ordered no such thing. Nor could it have. As the Court correctly concluded in 2011, it did not (and does not) have the authority to enter such an order. That is so for two reasons: (1) this Court has never had actual control over foreign res; and (2) DAS obtained funds following an adjudication by a foreign sovereign that had both jurisdiction and control over the at-issue account. The act of state doctrine bars a district court from reevaluating that adjudication.

### A.  This Court Has Never Had Actual Control Over The Swiss Res

To Optional, DAS' having obtained full relief in Switzerland while Optional

1    obtained a partial recovery after prolonged litigation in the federal court reflects a

2    deep conspiracy aimed at depriving Optional of its just compensation. On the other

3    hand, the federal circuit courts have consistently held that *jurisdiction* under civil

4    forfeiture statutes is not the same as *control* over the res that would allow the court to

5    enter an order regarding the disposition of assets. Optional conflates those two

6    distinct concepts.

7         The Ninth Circuit's analysis in *Total Aviation*, evaluating whether a California

8    district court had jurisdiction to adjudicate ownership of funds located in the Cayman

9    Islands, is instructive. The Ninth Circuit concluded that section 1355 permits the

10   exercise of "jurisdiction in the district courts without reference to constructive or

11   actual control of the res." *Total Aviation*, 513 F.3d at 998. That, however, does not

12   mean a district court has the ability to *effectuate* any judgment. Where res is located

13   in another country, "effectiveness of the forfeiture orders" depends on that country's

14   "compliance and cooperation." *Id.* at 997-98. When a district court does not have

15   control, "[i]t may well be that a forfeiture order [] will not have its full effect until the

16   res—the money—is brought within the territory of the United States" following a

17   MLAT request. *Banco Espanol*, 295 F.3d at 27; *see also Acct. No. 03001288*, 344

18   F.3d at 403. [8]

19        Here, the at-issue money was never brought into the United States following

20   the final judgment because by that point, the Swiss authorities had decided to release

21   the funds to DAS. This Court noted that while it "[t]echnically" retained jurisdiction,

22   the "diminishing [of] the value of the res… threatens to render any [judgment] a

23   merely academic exercise." RJN, Ex. X (ECF No. 780) at 14. This is hardly a unique

24   result; adjudication by foreign authorities with both jurisdiction and control may

25

26   ─────────────────

     [8] While the circuit courts appear to agree that Congress vested the district courts with
27   jurisdiction over forfeitures even when res is foreign, the Constitutionality of the grant
     of that jurisdiction has not been reached. *See Batato*, 833 F.3d at 435-40 (Floyd, J.
28   dissenting).

1  conflict with the judgment of a district court. *See, e.g. Batato*, 833 F.3d at 428-29; *see*

2  *also supra* at I.A. It is up to claimants to seek the cooperation of foreign governments

3  to avoid such conflicts. In the absence of voluntary cooperation, a district court lacks

4  the ability to issue orders transferring property in foreign control.

5        Optional chose not to pursue its claim in Switzerland, and the executive branch

6  there, having both jurisdiction and actual control, decided to end its money

7  laundering investigation. It lifted the last remaining freeze and ordered the transfer of

8  funds to DAS. That decision was executed years ago. The result is that this Court

9  cannot issue orders related to disposition of foreign res that the Swiss government

10  had already disposed.

11       **B.   The Act Of State Doctrine Bars The Court From Second-Guessing**

12           **The Swiss Prosecutor's Handling Of The Swiss Account**

13        As this Court acknowledged in 2011, DAS obtained the funds located in the

14  Credit Suisse account based on valid procedures in Switzerland. Regardless of

15  Optional's opinion about the fairness of those procedures, the act of state doctrine

16  bars any order that conflicts with the Swiss adjudication.

17        The act-of-state doctrine holds that "the courts of one country will not sit in

18  judgment on the acts of the government of another done within its own territory."

19  *Credit Suisse v. U.S. Dist. Court for Cent. Dist. of California*, 130 F.3d 1342, 1346

20  (9th Cir. 1997) (quoting *Underhill v. Hernandez,* 168 U.S. 250, 252 (1897)); *see also*

21  *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, 899 F.3d 1064 (9th Cir. 2018). Because it

22  arises from the separation of powers between the judicial and executive branches, the

23  doctrine has "constitutional underpinnings." *Banco Nacional de Cuba v. Sabbatino*,

24  376 U.S. 398, 423 (1964) (internal quotation marks omitted). "In its modern

25  formulation, the doctrine bars suit where (1) there is an official act of a foreign

26  sovereign performed within its own territory; and (2) the relief sought or the defense

27  interposed in the action would require a court in the United States to declare invalid

28  the foreign sovereign's official act." *Sea Breeze Salt*, 899 F.3d at 1069 (quotation

1 omitted).

2 As explained in detail *supra*, here, the decision to investigate the Kims, end the
3 criminal investigation, lift the freeze, and order the transfer of funds was undertaken
4 by the Swiss Prosecutor acting in that agency's official executive capacity. The
5 actions holding, releasing or transferring funds from a Swiss account certainly took
6 place in Switzerland. In order to strip DAS of those funds or their monetary
7 equivalent—setting all jurisdictional, prudential and precedential objections aside—
8 the Court would necessarily have to disagree with the Swiss Prosecutor's decisions.
9 Granting the relief Optional seeks would require the Court to "pass judgment on the
10 lawfulness of [the Swiss] decision." *Sea Breeze Salt*, 899 F.3d at 1071-72.

11 The Ninth Circuit addressed a nearly identical set of facts in *Credit Suisse*.
12 Class plaintiffs, victims of human rights abuses by former Philippine president
13 Ferdinand Marcos, attempted to reach Marcos' assets held by Credit Suisse in
14 Switzerland. 130 F.3d at 1347-48. The assets had been frozen by the Swiss
15 government at the request of the Republic of the Philippines, which was also seeking
16 to recover them. *Id.* Class plaintiffs obtained an injunction from the district court
17 requiring Credit Suisse to hold the funds for plaintiffs' benefit. *Id.* The Ninth Circuit
18 concluded that the injunction violated the act of state doctrine because issuing freeze
19 orders was "paradigmatically sovereign in nature." *Id.* Freezing accounts, releasing
20 them, investigating criminal complaints, accepting settlements and ordering funds
21 transferred are all "official acts" that are not of the kind "a private person can
22 exercise." *Id.* at 1347. The government of Switzerland made its own views known in
23 an amicus brief: it is "the view of the Government of Switzerland that its freeze order
24 was an act of state entitled to complete deference by U.S. courts." *See* RJN, Ex. OO
25 (Brief of Amicus Curiae Government of Switzerland in *Credit Suisse*), 1997 WL
26 33547057, at *12, 18. The Swiss government relayed the same message here. *See*
27 *supra* at Facts B, E. Courts are not to "question the validity of the freeze orders" or
28 the validity of a companion release order. *Credit Suisse*, 130 F.3d at 1348. The act of

state doctrine forbids such second-guessing to ensure that "United States courts … respect the independence of every other sovereign State, including Switzerland." *Id.* (quotation omitted).

Following *Credit Suisse*, the Swiss government released the funds to Philippine National Bank, which placed the funds in an account located in Singapore. *In re Philippine Nat'l. Bank*, 397 F.3d 768, 768-71 (9th Cir. 2005). The Philippine Supreme Court held that the assets were forfeited to the Republic of the Philippines. *Id.* As Optional requests here, the district court issued orders requiring notification and cause for any subsequent transfers, and an Order to Show Cause why the Philippine Bank should not be held in contempt for violating an injunction prohibiting transfers. *Id.* Once again, the Ninth Circuit issued a writ of mandamus, holding that the orders violated the act of state doctrine. *Id.* at 772. Because Credit Suisse "delivered the funds [] with the approval of the Swiss courts," the transfer was not subject to review by the district court. *Id.* at 774. So too here. As in *Credit Suisse* and *Philippine Nat'l Bank*, the transfer here was not "in the ordinary course of business," but with approval of the Swiss Prosecutor, which decided to discontinue its criminal investigation and order transfer of funds to DAS. *Id.*

Despite this Court's repeated findings that the Swiss authorities' independent orders precluded any order that DAS return funds (*see supra* at I.B.1), Optional has never argued that some exception to the act of state doctrine applies. Nor could it because Optional cannot come close to meeting the test the Supreme Court articulated in *Sabbatino*: "First, the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it. Second, the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches. And finally, "the balance of relevant considerations may also be shifted if the government which perpetuated the challenged act of state is no longer in existence." *Sea Breeze Salt*, 899 F.3d at 1072--73 (quotations, citations omitted).

1    The first factor generally involves foreign governmental action that would be
2    repudiated by international human rights law; in that situation, a court could still pass
3    judgment on the state actor. *See, e.g., Bodner v. Banque Paribas*, 114 F. Supp. 2d
4    117, 130 (E.D.N.Y. 2000) (the French Vichy government's policy of "the deprivation
5    of property based on race" violated a "widely-recognized principle of international
6    law"). There is no such consideration here. The Swiss government was engaged in a
7    routine criminal investigation. As to the second factor, the government of Switzerland
8    itself points out that the United States "has a vital interest" in prioritizing a good
9    working relationship together, as the U.S. government "requests this same type of
10   assistance from the Government of Switzerland" frequently. RJN, Ex. OO (Swiss
11   Amicus Brief) at 24. Finally, the continued existence of Switzerland's government
12   cannot be disputed.

13   This Court correctly emphasized the lack of ability to intrude in the lawful,
14   regular processes of a sovereign government with concurrent jurisdiction. There is no
15   reason to violate the act of state doctrine for a frivolous contempt proceeding that can
16   be denied on any number of bases.

17   **III.   COUNSEL SHOULD BE SANCTIONED FOR VEXATIOUS**
18   **MULTIPLICATION OF PROCEEDINGS**

19   Optional's application for an order to show cause is wholly devoid of merit.
20   Optional and its counsel know that the 2013 judgment does not and could not apply
21   to DAS and or the contested funds. There is no way to square Optional's effort with
22   the basic law of constructive trusts, in rem judgments or even common sense.
23   Nothing has changed in the Court's lack of actual control to render an effective
24   judgment over the Swiss funds then or now, and the act of state doctrine underscores
25   the deference owed to the executive branch of a valid, concurrent jurisdiction.

26   Optional's memorandum ignores the import of prior binding rulings in this
27   case that validate those proceedings, and makes no mention of the Swiss adjudication
28   that led to the transfer in the first place. Optional asserts to this Court that the 2013

1    final judgment ordered DAS to surrender the transferred funds, while hiding the

2    Court's explicit ruling that it would not order DAS to surrender the funds. The Ninth

3    Circuit recognizes that attorneys are officers of the court, and, consequently, have "a

4    duty of good faith and candor in dealing with the judiciary." *See Pacific Harbor*

5    *Capital, Inc. v. Carnival Air Lines, Inc.,* 210 F.3d 1112, 1119 (9th Cir.2000).  When

6    an attorney knowingly or recklessly misrepresents facts to a court, sanctions are

7    appropriate under § 1927.  *See id.* at 1120. "Recklessness satisfies [the bad faith]

8    standard" for awarding attorney's fees under § 1927. *Belliveau v. Thomson Financial*

9    *Inc.,* 313 Fed. Appx. 49, 50 (9th Cir. 2009).

10       It appears Optional has waited until now to file its application, instead of closer

11   in time to the judgment Optional claims to be enforcing, because Judge Collins is no

12   longer the judicial officer. After trying to disqualify Judge Collins twice because it

13   was unhappy with her rulings, Optional hopes to get another bite at the apple.[9]

14       The Court need not turn a blind eye to the likelihood of Optional's forum-

15   shopping, but neither would sanctions rest on this suspicion alone. The need for

16   sanctions results from counsel's deliberate lack of transparency in the motion, prior

17   inconsistent statements and lack of merit in this application. Congress passed 28 USC

18   § 1927 to allow courts a recourse in situations like these. Section 1927 reads: "Any

19   attorney ... who so multiplies the proceedings in any case unreasonably and

20   vexatiously may be required by the court to satisfy personally the excess ... [costs and

21   fees] ... incurred because of such conduct." "The statute is indifferent to the equities

22   of a dispute and to the values advanced by the substantive law. It is concerned only

23   with limiting the abuse of court processes." *Roadway Express v. Piper,* 447 U.S. 752,

24   _____

25   [9] Optional first made the attempt in 2010 on a separate motion, and again in 2012 as a
     tossed-in argument on appeal. RJN, Ex. QQ (Br. Of Appellant filed 4/3/2012) at 66-69
26   Neither effort succeeded.  *See United States v. 475 Martin Lane*, 406 Fed. Appx. 154,
     159 (9th Cir. 2010) (specifically denying Optional's motion for reassignment to a new
27   judge); *United States v. 475 Martin Lane*, 488 Fed. App'x 272 (9th Cir. 2012)
     (dismissing Optional's appeal no. 12-55417 entirely).

1 | 762 (1980).

2 |      The record is replete with reasons why Optional's seeking $12+ million in the

3 | form of a contempt motion is abusive process. DAS is willing to submit additional

4 | specific briefing to the Court if necessary. In that instance DAS would ask not only

5 | for attorney's fees and costs associated with this filing, but also in the pursuit of the

6 | sanctions themselves. *See Blixseth v. Yellowstone Mountain Club, LLC*, 854 F.3d

7 | 626, 636 (9th Cir. 2017) (joining other circuits to "conclude that the costs of

8 | obtaining sanctions may be included in a sanctions award under §1927").

9 | **CONCLUSION**

10 |      The Order to Show Cause should be dismissed. DAS requests consideration of

11 | sanctions under § 1927.

12 |

13 | Date: December 3, 2018            LTL ATTORNEYS LLP

14 |

15 |            By: /s/ Prashanth Chennakesavan

16 |                James M. Lee
Joe Tuffaha

17 |                Prashanth Chennakesavan
Sarah Silverton

18 |                Kevin B. Kelly

19 |                Attorneys for Respondent DAS
Corporation

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |